Mark Houser

Plaintiff, Pro Se

9015 E. Pima Center Parkway

Scottsdale, AZ 85258

Email: mhouser@gcbscorp.com

___ FILED    ___ LODGED
___ RECEIVED    ___ COPY

APR 2 3 2025

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____ DEPUTY

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

Mark Houser,

Plaintiff, Pro Se

v.

City of Scottsdale, et al.

Defendants.

Case No. 2:23-CV-01394-PHX-SMB (ESW)

**EXHIBITS TO MOTION FOR JUDICIAL NOTICE**

**EXHIBIT A – Arizona Administrative Code, Title 9, Chapter 21 (Select Rules and Exhibits)**

This exhibit includes selected pages from the Arizona Administrative Code governing the evaluation, involuntary detention, and treatment of persons with serious mental illness under Title 9, Chapter 21. These include:

- R9-21-202 (Right to Support and Treatment)

- R9-21-203 (Protection from Mistreatment)

- R9-21-206 and 206.01 (Competency and Informed Consent)

- R9-21-211 (Notice of Rights)

- R9-21-501, 502, 504 (Court-Ordered Evaluation, Emergency Admission, Treatment Requirements)

- Exhibits A, (Petition Templates and Physician Affidavit)

These provisions support Plaintiff's argument that the petition, detention, and continued involuntary treatment were carried out without statutory compliance, medical certification, or due process. The included rules show the legal structure SPD and associated agencies were required to follow but did not.

**EXHIBIT B – 42 U.S.C. § 9501 (Federal Mental Health Patients' Bill of Rights)**

This exhibit includes the statutory text and citation header for 42 U.S.C. § 9501, outlining individual rights guaranteed to persons subject to mental health treatment, including individualized care, consent, and protections from retaliation or non-medically justified treatment.

**EXHIBIT C – FY2020 Health Care Fraud and Abuse Control Program Report**

This excerpt includes the cover, executive summary, and early program results of the DOJ and HHS report jointly detailing federal enforcement of systemic psychiatric and healthcare-related fraud.

**CERTIFICATE OF SERVICE**

I hereby certify that on April 23, 2025, I served the foregoing Motion for Judicial Notice

Pursuant to FRE 201 (b)(2) via email to the following recipients:

Lori S. Davis, Esq.

Scottsdale City Attorney's Office

3939 North Drinkwater Boulevard

Scottsdale, AZ 85251

Email: lodavis@scottsdaleaz.gov


Lindsey M. Gomez-Gray, Esq.

Email: LGomezGray@scottsdaleaz.gov


Scottsdale City Attorney's Office

Email: legal@scottsdaleaz.gov

/s/ Mark Houser

Mark Houser, Pro Se

Email: mhouser@gcbscorp.com

TITLE 9. HEALTH SERVICES

CHAPTER 21. ARIZONA HEALTH CARE COST CONTAINMENT SYSTEM (AHCCCS) - BEHAVIORAL HEALTH SERVICES FOR PERSONS WITH SERIOUS MENTAL ILLNESS

parents of enrolled children and at least three members shall have expertise in one of the following areas: psychology, law, medicine, education, special education, social work, or behavioral health services.

**C.** The Department of Administration shall appoint the initial members to each regional committee and the Independent Oversight committee for the Arizona State Hospital. Members shall be appointed to fill vacancies on an Independent Oversight committee, subject to the approval of the committee.

**D.** Each committee shall meet at least four times each year. Within three months of its formation, each committee shall establish written guidelines governing the committee's operations. These guidelines shall be consistent with A.R.S. §§ 41-3803 and 41-3804. The adoption and amendment of the committee's guidelines shall be by a majority vote of the committee and shall be submitted to the Administration for approval.

**E.** No employee or individual under contract with the Administration, regional authority, or service provider may be a voting member of a committee.

**F.** If a member of an Independent Oversight committee or the Independent Oversight committee determines that a member has a conflict of interest regarding an agenda item, the member shall refrain from:
1. Participating in a discussion regarding the agenda item, and
2. Voting on the agenda item.

**G.** Each committee shall, within its respective jurisdiction, provide independent oversight and review of:
1. Allegations of illegal, dangerous, or inhumane treatment of clients;
2. Reports filed with the committee under R9-21-203 and R9-21-204 concerning the use of seclusion, restraint, abuse, neglect, exploitation, mistreatment, accidents, or injuries;
3. The provision of services to clients identified under R9-21-301 in need of special assistance;
4. Violations of rights of clients and conditions requiring investigation under Article 4 of this Chapter;
5. Research in the field of mental health according to A.R.S. § 41-3804(E); and
6. Any other issue affecting the human rights of clients.

**H.** Within its jurisdiction, each Independent Oversight committee shall, for a client who needs special assistance, and may, for other clients:
1. Make regular site visits to residential environments;
2. Meet with the client, including a client who needs special assistance, in residential environments to determine satisfaction of the clients with the residential environments; and
3. Inspect client records, upon written request to the Administration, including client records for clients who need special assistance, except as prohibited by federal or state law and a client's right to privacy.

**I.** A committee may request the services of a consultant or staff person to advise the committee on specific issues. The cost of the consultant or staff person shall be assumed by the Administration or health plan subject to the availability of funds specifically allocated for that purpose. A consultant or staff person may, in the sole discretion of the committee, be a member of another committee or an employee of the Administration, health plan, or service provider. No committee consultant or staff person shall vote or otherwise direct the committee's decisions.

**J.** Committee members and committee consultants and staff persons shall have access to client records according to A.R.S. §§ 36-509(A)(11) and 41-3804(I). If an Independent Oversight committee's request for information or records is denied, the committee may request a review of the decision to deny the request according to A.R.S. § 41-3804(J). Nothing in this Section shall be construed to require the disclosure of records or information to the extent that such information is protected by A.R.S. § 36-445 et seq.

**K.** On the first day of the months of January, April, July, and October of each year, each committee shall issue a quarterly report summarizing its activities for the prior quarter, including any written objections to the Department of Administration according to A.R.S. § 41-3804, and make any recommendations for changes it believes the Administration or health plans should implement. In addition, the committee may, as it deems appropriate, issue reports on specific problems or violations of client's rights. The report of a regional committee shall be delivered to the Administration.

**L.** The Department of Administration shall provide training and support to Independent Oversight committees.

**M.** An Independent Oversight committee may request:
1. An investigation for a client according to this Chapter, or
2. A health plan or the Arizona State Hospital, as applicable, to conduct an investigation for an enrolled child.

**N.** The health plan or the Arizona State Hospital, as applicable, when requested by an Independent Oversight committee, shall conduct an investigation concerning a client as provided in Article 4 of this Chapter.

**O.** An Independent Oversight committee shall submit an annual report of the Independent Oversight committee's activities and recommendations to the Director at the end of each calendar year according to A.R.S. § 41-3804(G).

**Historical Note**

Adopted under an exemption from A.R.S. Title 41, Chapter 6 pursuant to Laws 1992, Ch. 301, § 61, effective October 7, 1992; received in the Office of the Secretary of State October 14, 1992 (Supp. 92-4). Amended under an exemption from A.R.S. Title 41, Chapter 6 pursuant to Laws 1992, Ch. 301, § 61, effective September 30, 1993 (Supp. 93-3). Former Section R9-21-105 renumbered to R9-21-104; new Section R9-21-105 renumbered from R9-21-106 and amended by exempt rulemaking at 9 A.A.R. 3296, effective June 30, 2003 (Supp. 03-2). Amended by final rulemaking at 22 A.A.R. 2019, effective July 12, 2016 (Supp. 16-4). Amended by final rulemaking at 29 A.A.R. 898 (April 21, 2023), effective May 30, 2023 (Supp. 23-1).

**R9-21-106.      State Protection and Advocacy System**

Staff of mental health agencies shall cooperate with the State Protection and Advocacy System in its investigations and advocacy for clients and shall provide the System access to clients, records and facilities to the extent permitted and required by federal law, 42 U.S.C. 10801-10851. Nothing in this Section shall be construed to create an independent cause of action that does not already exist for the State Protection and Advocacy System either in state court or any administrative proceeding provided by this Chapter.

**Historical Note**

Adopted under an exemption from A.R.S. Title 41, Chapter 6 pursuant to Laws 1992, Ch. 301, § 61, effective October 7, 1992; received in the Office of the Secretary of State October 14, 1992 (Supp. 92-4). Amended under an exemption from A.R.S. Title 41, Chapter 6 pursuant to

**9 A.A.C. 21**                    *Arizona Administrative Code*

TITLE 9. HEALTH SERVICES

CHAPTER 21. ARIZONA HEALTH CARE COST CONTAINMENT SYSTEM (AHCCCS) - BEHAVIORAL HEALTH SERVICES
FOR PERSONS WITH SERIOUS MENTAL ILLNESS

Laws 1992, Ch. 301, § 61, effective September 30, 1993 (Supp. 93-3). Amended by exempt rulemaking at 7 A.A.R. 3469, effective July 17, 2001 (Supp. 01-3). Former Section R9-21-106 renumbered to R9-21-105; new Section R9-21-106 renumbered from R9-21-107 by exempt rulemaking at 9 A.A.R. 3296, effective June 30, 2003 (Supp. 03-2). Amended by final rulemaking at 22 A.A.R. 2019, effective July 12, 2016 (Supp. 16-4).

**R9-21-107.    Renumbered**

**Historical Note**

Adopted under an exemption from A.R.S. Title 41, Chapter 6 pursuant to Laws 1992, Ch. 301, § 61, effective October 7, 1992; received in the Office of the Secretary of State October 14, 1992 (Supp. 92-4). Renumbered to R9-21-106 by exempt rulemaking at 9 A.A.R. 3296, effective June 30, 2003 (Supp. 03-2).

**ARTICLE 2. RIGHTS OF PERSONS WITH SERIOUS MENTAL ILLNESS**

**R9-21-201.    Civil and Other Legal Rights**

A.  Clients shall have all rights accorded by applicable law, including but not limited to those prescribed in A.R.S. §§ 36-504 through 36-517.02. Any individual or agency providing behavioral health services or community services as defined in R9-21-101 shall not abridge these rights, including the following:
1.  Those civil rights set forth in A.R.S. § 36-506;
2.  The right to acquire and dispose of property, to execute instruments, to enter into contractual relationships, to hold professional or occupational or vehicle operator's licenses, unless the client has been adjudicated incompetent or there has been a judicial order or finding that such client is unable to exercise the specific right or category of rights. In the case of a client adjudicated incompetent, these rights may be exercised by the client's guardian, in accordance with applicable law;
3.  The right to be free from unlawful discrimination by the Administration or by any mental health agency on the basis of race, creed, religion, sex, sexual preference, age, physical or mental handicap or degree of handicap; provided, however, classifications based on age, sex, category or degree of handicap shall not be considered discriminatory, if based on written criteria of client selection developed by a mental health agency and approved by the Administration as necessary to the safe operation of the mental health agency and in the best interests of the clients involved;
4.  The right to equal access to all existing behavioral health services, community services, and generic services provided by or through the state of Arizona;
5.  The right to religious freedom and practice, without compulsion and according to the preference of the client;
6.  The right to vote, unless under guardianship, including reasonable assistance when desired in registering and voting in a nonpartisan and noncoercive manner;
7.  The right to communicate including:
    a.  The right to have reasonable access to a telephone and reasonable opportunities to make and receive confidential calls and to have assistance when desired and necessary to implement this right;
    b.  The unrestricted right to send and receive uncensored and unopened mail, to be provided with stationery and postage in reasonable amounts, and to

receive assistance when desired and necessary to implement this right;
8.  The right to be visited and visit with others, provided that reasonable restrictions may be placed on the time and place of the visit but only to protect the privacy of other clients or to avoid serious disruptions in the normal functioning of the mental health agency;
9.  The right to associate with anyone of the client's choosing, to form associations, and to discuss as a group, with those responsible for the program, matters of general interest to the client, provided that these do not result in serious disruptions in the normal functioning of the mental health agency. Clients shall receive cooperation from the mental health agency if they desire to publicize and hold meetings and clients shall be entitled to invite visitors to attend and participate in such meetings, provided that they do not result in serious disruptions in the normal functioning of the mental health agency;
10.  The right to privacy, including the right not to be fingerprinted and photographed without authorization, except as provided by A.R.S. § 36-507(2);
11.  The right to be informed, in appropriate language and terms, of client rights;
12.  The right to assert grievances with respect to infringement of these rights, including the right to have such grievances considered in a fair, timely, and impartial procedure, as set forth in Article 4 of this Chapter, and the right not to be retaliated against for filing a grievance;
13.  The right of access to the Office of Human Rights to request assistance in order to understand, exercise, and protect a client's rights;
14.  The right to be assisted by an attorney or designated representative of the client's own choice, including the right to meet in a private area at the program or facility with an attorney or designated representative. Nothing in this Chapter shall be construed to require the Administration or any mental health agency to pay for the services of an attorney who consults with or represents a client;
15.  The right to exercise all other rights, entitlements, privileges, immunities provided by law, and specifically those rights of consumers of behavioral health services or community services set forth in A.R.S. §§ 36-504 through 36-517.02;
16.  The same civil rights as all other citizens of Arizona, including the right to marry and to obtain a divorce, to have a family, and to live in the community of their choice without constraints upon their independence, except those constraints to which all citizens are subject.
B.  Nothing in this Article shall be interpreted to:
1.  Give the power, right, or authority to any person or mental health agency to authorize sterilization, abortion, or psychosurgery with respect to any client, except as may otherwise be provided by law; or
2.  Restrict the right of physicians, nurses, and emergency medical technicians to render emergency care or treatment in accordance with A.R.S. § 36-512; or
3.  Construe this rule to confer constitutional or statutory rights not already present.

**Historical Note**

Adopted under an exemption from A.R.S. Title 41, Chapter 6 pursuant to Laws 1992, Ch. 301, § 61, effective October 7, 1992; received in the Office of the Secretary of State October 14, 1992 (Supp. 92-4). Amended under an exemption from A.R.S. Title 41, Chapter 6 pursuant to

Exhibit A

TITLE 9. HEALTH SERVICES

CHAPTER 21. ARIZONA HEALTH CARE COST CONTAINMENT SYSTEM (AHCCCS) - BEHAVIORAL HEALTH SERVICES FOR PERSONS WITH SERIOUS MENTAL ILLNESS

    c.   Complies with the mental health agency's policies and procedures required in subsection (E) and with this Section.

**C.**  A mental health agency shall not use restraint or seclusion as a means of coercion, discipline, convenience, or retaliation.

**D.**  A service provider shall at all times have staff qualified on duty to provide:
1. Restraint and seclusion according to this Section, and
2. The behavioral health services the mental health agency is authorized to provide.

**E.**  A mental health agency shall develop and implement written policies and procedures for the use of restraint and seclusion that are consistent with this Section and other applicable federal or state law and include:
1. Methods of controlling behavior that may prevent the need for restraint or seclusion,
2. Appropriate techniques for placing a client in each type of restraint or seclusion; used at the mental health agency, and
3. Immediate release of a client during an emergency.

**F.**  A mental health agency shall develop and implement a training program on the policies and procedures in subsection (E).

**G.**  A mental health agency shall only use restraint or seclusion according to:
1. A written order given:
   a. By a physician providing treatment to a client; or
   b. If a physician providing treatment to a client is not present on the premises or on-call:
      i. If the agency is licensed as a level 1 psychiatric acute hospital, by a physician or a nurse practitioner; or
      ii. If the agency is licensed as a level 1 subacute agency or a level 1 RTC, by a medical practitioner.
2. An oral order given to a nurse by:
   a. A physician providing treatment to a client, or
   b. If a physician providing treatment to a client is not present on the premises or on-call:
      i. If the agency is licensed as a level 1 psychiatric acute hospital, by a physician or a nurse practitioner; or
      ii. If the agency is licensed as a level 1 sub-acute agency or a level 1 RTC, by a medical practitioner.

**H.**  If a restraint or seclusion is used according to subsection (G)(2), the individual giving the order shall, at the time of the oral order in consultation with the nurse, determine whether, based upon the client's current and past medical, physical and psychiatric condition, it is clinically necessary for:
1. If the agency is licensed as a level 1 psychiatric acute hospital, a physician to examine the client as soon as possible and, if applicable, the physician shall examine the client as soon as possible; or
2. If the agency is licensed as a level 1 sub-acute agency or a level 1 RTC, a medical practitioner to examine the client as soon as possible and, if applicable, the medical practitioner shall examine the client as soon as possible.

**I.**  An individual who gives an order for restraint or seclusion shall:
1. Order the least restrictive restraint or seclusion that may resolve the client's behavior that is creating the emergency safety situation, based upon consultation with a staff member at the agency;
2. Be available to the agency for consultation, at least by telephone, throughout the period of the restraint or seclusion;
3. Include the following information on the order:
   a. The name of the individual ordering the restraint or seclusion,
   b. The date and time that the restraint or seclusion was ordered,
   c. The restraint or seclusion ordered,
   d. The criteria for release from restraint or seclusion without an additional order, and
   e. The maximum duration for the restraint or seclusion;
4. If the order is for mechanical restraint or seclusion, limit the order to a period of time not to exceed three hours.
5. If the order is for a drug used as a restraint, limit:
   a. Dosage to that necessary to achieve the desired effect, and
   b. Drug ordered to a drug other than a time-released drug designed to be effective for more than three hours; and
6. If the individual ordering the use of restraint or seclusion is not a physician providing treatment to the client:
   a. After ordering the restraint or seclusion, consult with the physician providing treatment as soon as possible, and
   b. Inform the physician providing treatment of the client's behavior that created the emergency safety situation and required the client to be restrained or placed in seclusion.

**J.**  PRN orders shall not be used for any form of restraint or seclusion.

**K.**  If an individual has not examined the client according to subsection (H), the following individual shall conduct a face-to-face assessment of a client's physical and psychological well-being within one hour after the initiation of restraint or seclusion:
1. For a behavioral health agency licensed as a level 1 psychiatric acute hospital, a physician or nurse practitioner who is either on-site or on-call at the time the mental health agency initiates the restraint or seclusion; or
2. For a behavioral health agency licensed as a level 1 RTC or a level 1 sub-acute agency a medical practitioner or a registered nurse with at least one year of full time behavioral health work experience, who is either on-site or on-call at the time the mental health agency initiates the restraint or seclusion.

**L.**  A face-to-face assessment of a client according to subsection (K) shall include a determination of:
1. The client's physical and psychological status,
2. The client's behavior,
3. The appropriateness of the restraint or seclusion used,
4. Whether the emergency safety situation has passed, and
5. Any complication resulting from the restraint or seclusion used.

**M.**  For each restraint or seclusion of a client, a mental health agency shall include in the client's record the order and any renewal order for the restraint or seclusion, and shall document in the client's record:
1. The nature of the restraint or seclusion;
2. The reason for the restraint or seclusion, including the facts and behaviors justifying it;
3. The types of less restrictive alternatives that were attempted and the reasons for the failure of the less restrictive alternatives;

Exhibit A

TITLE 9. HEALTH SERVICES

CHAPTER 21. ARIZONA HEALTH CARE COST CONTAINMENT SYSTEM (AHCCCS) - BEHAVIORAL HEALTH SERVICES FOR PERSONS WITH SERIOUS MENTAL ILLNESS

4. The name of each individual authorizing the use of restraint or seclusion and each individual restraining or secluding a client or monitoring a client who is in restraint or seclusion;

5. The evaluation and assessment of the need for seclusion or restraint conducted by the individual who ordered the restraint or seclusion;

6. The determination and the reasons for the determination made according to subsection (H);

7. The specific and measurable criteria for client release from mechanical restraint or seclusion with documentation to support that the client was notified of the release criteria and the client's response;

8. The date and times the restraint or seclusion actually began and ended;

9. The time and results of the face-to-face assessment required in subsection (L);

10. For the monitoring of a client in restraint or seclusion required by subsection (P):
    a. The time of the monitoring,
    b. The name of the staff member who conducted the monitoring, and
    c. The observations made by the staff member during the monitoring; and

11. The outcome of the restraint or seclusion.

N. If, at any time during a seclusion or restraint, a medical practitioner or registered nurse determines that the emergency which justified the seclusion or restraint has subsided, or if the required documentation reflects that the criteria for release have been met, the client shall be released and the order terminated. The client shall be released no later than the end of the period of time ordered for the restraint or seclusion, unless the order for restraint or seclusion is renewed according to subsection (Q).

O. For any client in restraint, the individual ordering the restraint shall determine whether one-to-one supervision is clinically necessary and shall document the determination and the reasons for the determination in the client's record.

P. A mental health agency shall monitor a client in restraint or seclusion as follows:

1. The client shall be personally examined at least every 15 minutes for the purpose of ensuring the client's general comfort and safety and determining the client's need for food, fluid, bathing, and access to the toilet. Personal examinations shall be conducted by staff members with documented training in the appropriate use of restraint and seclusion and who are working under the supervision of a licensed physician, nurse practitioner or registered nurse.

2. A registered nurse shall personally examine the client every hour to assess the status of the client's mental and physical condition and to ensure the client's continued well-being.

3. If the client has any medical condition that may be adversely affected by the restraint or seclusion, the client shall be monitored every five minutes, until the medical condition resolves, if applicable.

4. If other clients have access to a client being restrained or secluded or, if the individual ordering the restraint or seclusion determines that one-to-one supervision is clinically necessary according to subsection (O), a staff member shall continuously supervise the client on a one-to-one basis.

5. If a mental health agency maintains a client in a mechanical restraint, a staff member shall loosen the mechanical restraints every 15 minutes.

6. Nutritious meals shall not be withheld from a client who is restrained or secluded, if mealtimes fall during the period of restraint. Staff shall supervise all meals provided to the client while in restraint or seclusion.

7. At least once every two hours, a client who is restrained or secluded shall be given the opportunity to use a toilet.

Q. An order for restraint or seclusion may be renewed as follows:

1. For the first renewal order, the order shall meet the requirements of subsection (G)(1) or (G)(2); and

2. For a renewal order subsequent to the first renewal order:
   a. The individual in (G)(1) or (G)(2) shall personally examine the client before giving the renewal order, and
   b. The order shall not permit the continuation of the restraint or seclusion for more than 12 consecutive hours unless the requirements of subsection (P) are met.

R. No restraint or seclusion shall continue for more than 12 consecutive hours without the review and approval by the medical director or designee of the mental health agency in consultation with the client and relevant staff to discuss and evaluate the needs of the client. The review and approval, if any, and the reasons justifying any continued restraint or seclusion shall be documented in the client's record.

S. If a client requires the repeated or continuous use of restraint or seclusion during a 24-hour period, a review process shall be initiated immediately and shall include the client and all relevant staff persons and clinical consultants who are available to evaluate the need for an alternative treatment setting and the needs of the client. The review and its findings and recommendations shall be documented in the client's record.

T. Whenever a client is subjected to extended or repeated orders for restraint or seclusion during a 30-day period, the medical director shall require a special meeting of the client's clinical team according to R9-21-314 to determine whether other treatment interventions would be useful and whether modifications of the ISP or ITDP are required.

U. As part of a mental health agency's quality assurance program, an audit will be conducted and a report filed with the agency's medical director within 24 hours, or the first working day, for every episode of the use of restraint or seclusion to ensure that the agency's use of seclusion or restraint is in full compliance with the rules set forth in this Article.

V. Not later than the tenth day of every month, the program director shall prepare and file with the Administration and the Office of Human Rights a written report describing the use of any form of restraint or seclusion during the preceding month in the mental health agency or by any employees of the agency. In the case of an inpatient facility, the report shall also be filed with any patient or human rights committee for that facility.

W. The Office of Human Rights, and any applicable human rights committee shall review such reports to determine if there has been any inappropriate or unlawful use of restraint or seclusion and to determine if restraint or seclusion may be used in a more effective or appropriate fashion.

X. If any human rights committee or the Office of Human Rights determines that restraint or seclusion has been used in violation of any applicable law or rule, the committee or Office may take whatever action is appropriate, including investigat-

Exhibit A

TITLE 9. HEALTH SERVICES

CHAPTER 21. ARIZONA HEALTH CARE COST CONTAINMENT SYSTEM (AHCCCS) - BEHAVIORAL HEALTH SERVICES FOR PERSONS WITH SERIOUS MENTAL ILLNESS

1. Psychotropic medication shall be prescribed by:
   a. A psychiatrist who is a licensed physician; or
   b. A licensed nurse practitioner, certified physician assistant, or physician trained or experienced in the use of psychotropic medication, who has seen the client and is familiar with the client's medical history or, in an emergency, is at least familiar with the client's medical history.
2. Each client receiving psychotropic medication shall be seen monthly or as indicated in the client's ISP by a licensed nurse practitioner, certified physician's assistant or physician prescribing the medication, who shall note in the client's record:
   a. The appropriateness of the current dosage,
   b. All medication being taken by the client and the appropriateness of the mixture of medications,
   c. Any signs of tardive dyskinesia or other side effects,
   d. The reason for the use of the medication, and
   e. The effectiveness of the medication.
3. When a client on psychotropic medication receives a yearly physical examination, the results of the examination shall be reviewed by the physician prescribing the medication. The physician shall note any adverse effects of the continued use of the prescribed psychotropic medication in the client's record.
4. Whenever a prescription for medication is written or changed, a notation of the medication, dosage, frequency of administration, and the reason why the medication was ordered or changed shall be entered in the client's record.

E. Self-administration of medication by clients shall be permitted unless otherwise restricted by the responsible physician or licensed nurse practitioner. Such clients shall be trained in self-administration of medication and, if necessary, shall be monitored by trained staff.

F. Drugs shall be stored under proper conditions of sanitation, temperature, light, moisture, ventilation, segregation and security.

G. PRN orders for medication shall not be given for a drug used as a restraint.

### Historical Note

Adopted under an exemption from A.R.S. Title 41, Chapter 6 pursuant to Laws 1992, Ch. 301, § 61, effective October 7, 1992; received in the Office of the Secretary of State October 14, 1992 (Supp. 92-4). Amended under an exemption from A.R.S. Title 41, Chapter 6 pursuant to Laws 1992, Ch. 301, § 61, effective September 30, 1993 (Supp. 93-3). Amended by exempt rulemaking at 9 A.A.R. 3296, effective June 30, 2003 (Supp. 03-2).

### R9-21-208.     Property and Possessions

A. No mental health agency shall interfere with a client's right to acquire, retain and dispose of personal property, including the right to maintain an individual bank account, except where:
1. The client is under guardianship, conservatorship, or has a representative payee;
2. Otherwise ordered by court; or
3. A particular object, other than money or personal funds, poses an imminent threat of serious physical harm to the client or others. Any restriction on the client's control of property deemed to pose an imminent threat of serious physical harm shall be recorded in the client's record together with the reasons the particular object poses an imminent threat of serious physical harm to the client or others.

B. If a mental health agency, which offers assistance to its clients in managing their funds, takes possession or control of a client's funds at the request of the client, guardian, or by court order, the mental health agency shall issue a receipt to the client or guardian for each transaction involving such funds. If deposited funds in excess of $250 are held by the mental health agency, where the likelihood of the client's stay will exceed 30 days, an individual bank account or an amalgamated client trust account shall be maintained for the benefit of the client. All interest shall become the property of the client or the fair allocation of the interest in the case of an amalgamated client trust account. The mental health agency shall provide a bond to cover client funds held.
1. Unless a guardian, conservator, or representative payee has been appointed, the client shall have an unrestricted right to manage and spend deposited funds.
2. The mental health agency shall obtain prior written permission from the client, the guardian or conservator for any arrangement involving shared or delegated management responsibilities. The permission shall set forth the terms and conditions of the arrangement.
3. Where the mental health agency has shared or delegated management responsibilities, the mental health agency shall meet the following requirements:
   a. Client funds shall not be applied to goods or services which the mental health agency is obligated by law or funded by contract to provide, except as permitted by a client fee schedule authorized by the Administration;
   b. The mental health agency and its staff shall have no direct or indirect ownership or survivorship interest in the funds;
   c. Such arrangements shall be accompanied by a training program, documented in the ISP, to eliminate the need for such assistance;
   d. Staff shall not participate in arrangements for shared or delegated management of the client's funds except as representatives of the mental health agency;
   e. Any arrangements made to transfer a client from one mental health agency to another shall include provisions for transferring shared or delegated management responsibilities to the receiving mental health agency;
   f. The client shall be informed of all proposed expenditures and any expression of preference within reason shall be honored; and
   g. Expenditures shall be made only for purposes which directly benefit the client in accordance with the client's interests and desires.
4. A record shall be kept of every transaction involving deposited funds, including the date and amount received or disbursed, and the name of the person to or from whom the funds are received or disbursed. The client, guardian, conservator, mental health agency or regional human rights advocate or other representative may demand an accounting at any reasonable time, including at the time of the client's transfer, discharge or death.
5. Any funds so deposited shall be treated for the purpose of collecting charges for care the same as any other property held by or on behalf of the client. The client or guardian shall be informed of any possible charges before the onset of services.

Exhibit A

TITLE 9. HEALTH SERVICES

CHAPTER 21. ARIZONA HEALTH CARE COST CONTAINMENT SYSTEM (AHCCCS) - BEHAVIORAL HEALTH SERVICES
FOR PERSONS WITH SERIOUS MENTAL ILLNESS

**A.** Any grievant or the client who is the subject of the grievance who is dissatisfied with the final decision of the agency director may, within 30 days of receipt of the decision, file a notice of appeal with the Administration. The appealing party shall send copies of the notice to the other parties and their representatives and to the agency director who shall forward the full case record to the Administration.

**B.** The Administration shall review the notice of appeal and the case record, and may discuss the matter with any of the persons involved or convene an informal conference. Within 15 days of the filing of the appeal, the Administration shall prepare a written, dated decision which shall either:
1. Accept the investigator's report, in whole or in part, at least with respect to the facts as found, and affirm, modify or reject the decision of the agency director with a statement of reasons; or
2. Reject the investigator's report for insufficiency of facts and return the matter with instructions to the agency director for further investigation and decision. In such event, the further investigation shall be completed and a revised report and decision shall be delivered to the Administration within 10 days. Upon receipt of the report and decision, the Administration shall render a final decision, consistent with the procedures set forth in subsection (B)(1).
3. A designated representative shall be afforded the opportunity to be present at any meeting or conference convened by the Administration to which the represented party is invited.
4. The Administration shall send copies of the decision to:
   a. The parties, together with a notice of appeal rights according to A.R.S. § 41-1092.03;
   b. The agency director; and
   c. The Office of Human Rights and the applicable Independent Oversight Committee for all clients, including clients who are in need of special assistance.

**Historical Note**
Adopted under an exemption from A.R.S. Title 41, Chapter 6 pursuant to Laws 1992, Ch. 301, § 61, effective October 7, 1992; received in the Office of the Secretary of State October 14, 1992 (Supp. 92-4). Amended under an exemption from A.R.S. Title 41, Chapter 6 pursuant to Laws 1992, Ch. 301, § 61, effective September 30, 1993 (Supp. 93-3). Former Section R9-21-407 renumbered to R9-21-408; new Section R9-21-407 renumbered from R9-21-406 and amended by exempt rulemaking at 9 A.A.R. 3296, effective June 30, 2003 (Supp. 03-2). Amended by final rulemaking at 22 A.A.R. 2019, effective July 12, 2016 (Supp. 16-4). Amended by final rulemaking at 29 A.A.R. 898 (April 21, 2023), effective May 30, 2023 (Supp. 23-1).

**R9-21-408. Further Appeal to Administrative Hearing**
**A.** Any grievant or the client who is the subject of the grievance who is dissatisfied with the Director's decision of the Administration may request a state fair hearing before an Administrative Law Judge.
1. Within 30 days of the date of the Director's decision, the appealing party shall file with the Administration a notice requesting a state fair hearing.
2. Upon receipt of the notice, the Administration shall send a copy to the parties, and to the Office of Human Rights

and the Independent Oversight Committee for clients who are in need of special assistance.

**B.** The hearing shall be conducted consistent with A.R.S. § 41-1092 et seq., and those portions of 9 A.A.C. 1 which are consistent with this Article.
1. The client shall have the right to be represented at the hearing by an individual chosen by the client at the client's own expense, in accordance with Rule 31, Rules of the Supreme Court. If the client has not designated a representative to assist the client at the hearing and is in need of special assistance, the human rights committee, or the human rights advocate unless refused by the client, shall make all reasonable efforts to represent the client.
2. Any portion of the hearing may be closed to the public if the client requests or if the Administrative Law Judge determines that it is necessary to prevent an unwarranted invasion of the client's privacy or that public disclosure would pose a substantial risk of harm to the client.
3. The Administration shall explain the Director's decision to the client at the client's request, together with the right to seek rehearing and judicial review.

**Historical Note**
Adopted under an exemption from A.R.S. Title 41, Chapter 6 pursuant to Laws 1992, Ch. 301, § 61, effective October 7, 1992; received in the Office of the Secretary of State October 14, 1992 (Supp. 92-4). Section repealed; new Section R9-21-408 renumbered from R9-21-407 and amended by exempt rulemaking at 9 A.A.R. 3296, effective June 30, 2003 (Supp. 03-2). Amended by final rulemaking at 22 A.A.R. 2019, effective July 12, 2016 (Supp. 16-4). Amended by final rulemaking at 29 A.A.R. 898 (April 21, 2023), effective May 30, 2023 (Supp. 23-1).

**R9-21-409. Notice and Records**
**A.** Notice to clients. All clients shall be informed of their right to file a grievance or request for investigation under this Article.
1. Notice of this grievance and investigation process shall be included in the information posted or otherwise provided to every current and new client and employee. Special efforts shall be made to inform current and new residents of mental health facilities of this process and of the right to file a grievance or request for investigation;
2. A copy of a brief memorandum explaining these rules shall be given to every current and new resident of a inpatient facility;
3. Such memorandum and blank copies of the forms for filing a grievance, request for investigation, and appeal shall be posted in a prominent place in plain sight on every unit of an inpatient facility or in a program operated by a service provider; and
4. Such memoranda, forms and copies of these rules shall be available at each inpatient facility, health plan and service provider upon request by any person at any time.

**B.** Notice and oversight by the Office of Human Rights and Independent Oversight Committees.
1. Upon receipt of any grievance or request for investigation involving a client, including a client who is in need of special assistance, the agency director shall immediately forward a copy of such grievance or request to the Office of Human Rights and the appropriate regional Independent Oversight Committee.
2. Upon receipt of such a grievance from the agency director, at the request of a client, or on its own initiative, the

CHAPTER 21. ARIZONA HEALTH CARE COST CONTAINMENT SYSTEM (AHCCCS) - BEHAVIORAL HEALTH SERVICES
FOR PERSONS WITH SERIOUS MENTAL ILLNESS

Office of Human Rights and/or the appropriate Independent Oversight Committee shall assist a client in filing a grievance or request, if necessary. The Office and/or committee shall use its best efforts to see that such client is represented by an attorney, human rights advocate, committee member, or other person to protect the individual's interests and present information on the client's behalf. The Office and/or committee shall maintain a list of attorneys and other representatives, including the state protection and advocacy system, available to assist clients.

3. Whenever the Independent Oversight Committee has reason to believe that a rights violation involving abuse or a dangerous condition requiring investigation, including a client death, has occurred or currently exists, or that any rights violation or condition requiring investigation occurred or exists which involves a client who is in need of special assistance, it may, upon written notice and a release signed by the member, or designated representative, giving permission for the IOC to join, sent to the official before whom the matter is pending, become a party to the grievance or request. As a party it shall receive copies of all reports, plans, appeals, notices and other significant documents relevant to the resolution of the grievance or request and be able to appeal any finding or decision.

4. The Office of Human Rights shall assist clients in resolving grievances according to R9-21-104.

C. Notification of other persons.
   1. Whenever any rule, regulation, statute, or other law requires notification of a law enforcement officer, public official, medical examiner, or other person that an incident involving the death, abuse, neglect, or threat to a client has occurred, or that there exists a dangerous condition or event, such notice shall be given as required by law.
   2. A mental health agency shall immediately notify the Administration when:
      a. A client brings criminal charges against an employee;
      b. An employee brings criminal charges against a client;
      c. An employee or client is indicted or convicted because of any action required to be investigated by this Article;
      d. A client of an inpatient facility, a mental health agency, or a service provider dies. The agency director shall report such death according to the Administration's policy on the reporting and investigation of deaths;
      e. A client of an inpatient facility, a mental health agency, or a service provider allegedly is physically or sexually abused.
   3. The investigation by the Administration provided for by this Article is independent of any investigation conducted by police, the county attorney, or other authority.

D. Case records.
   1. A file, known as the case record, shall be kept for each grievance or request for investigation which is received by the Administration, ASH, health plan or service provider under contract or subcontract with the Administration. The record shall include the grievance or request, the docket number or matter number assigned, the names of all persons interviewed and the dates of those inter-

views, either a taped or written summary of those interviews, a summary of documents reviewed, copies of memoranda generated by the investigation, the investigator's report, the agency director's decision, and all documents relating to any appeal.
   2. The investigator shall maintain possession of the case record until the investigation report is submitted. Thereafter, the agency director shall maintain control over the case record, except when the matter is on appeal. During any appeal, the record will be in the custody of the official who hears or decides the appeal.

E. Public logs.
   1. The Administration and health plan shall maintain logs of deaths and non-frivolous grievances or requests for investigation for inpatient facilities, agencies, service providers, and mental health agencies which it operates, funds, or supervises.
   2. The log maintained by the Administration shall not include personally identifiable information and shall be a public record, available for inspection and copying by any person.
   3. With respect to each grievance or request for investigation, the Administration's log shall contain:
      a. A unique docket number or matter number;
      b. A substantive but concise description of the grievance or request for investigation;
      c. The date of the filing of grievance;
      d. The date of the initial decision or appointment of investigator;
      e. The date of the filing of the investigator's final report;
      f. A substantive but concise description of the investigator's final report;
      g. The date of all subsequent decisions, appeals, or other relevant events; and
      h. A substantive but concise description of the final decision and the action taken by the mental health agency or the Administration.

**Historical Note**
Adopted under an exemption from A.R.S. Title 41, Chapter 6 pursuant to Laws 1992, Ch. 301, § 61, effective October 7, 1992; received in the Office of the Secretary of State October 14, 1992 (Supp. 92-4). Amended under an exemption from A.R.S. Title 41, Chapter 6 pursuant to Laws 1992, Ch. 301, § 61, effective September 30, 1993 (Supp. 93-3). Amended by exempt rulemaking at 9 A.A.R. 3296, effective June 30, 2003 (Supp. 03-2). Amended by final rulemaking at 22 A.A.R. 2019, effective July 12, 2016 (Supp. 16-4). Amended by final rulemaking at 29 A.A.R. 898 (April 21, 2023), effective May 30, 2023 (Supp. 23-1).

**R9-21-410.    Miscellaneous**
A. Disqualification of official. The agency director, investigator, or any other official with authority to act on a grievance or request for investigation shall disqualify himself from acting, if such official cannot act on the matter impartially and objectively, in fact or in appearance. In the event of such disqualification, the official shall forthwith prepare and forward a written, dated memorandum explaining the reasons for the decision to the Administration, as appropriate, who shall, within 10 days of receipt of the memorandum make a determination upon the appropriateness of the disqualification and notify.

Exhibit A

TITLE 9. HEALTH SERVICES

CHAPTER 21. ARIZONA HEALTH CARE COST CONTAINMENT SYSTEM (AHCCCS) - BEHAVIORAL HEALTH SERVICES
FOR PERSONS WITH SERIOUS MENTAL ILLNESS

**Exhibit B.    Petition for Court-ordered Evaluation**

**PETITION FOR COURT-ORDERED EVALUATION**

**IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
IN AND FOR THE COUNTY OF** _____

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | MH _____ |
| | ) | |
| | ) | PETITION FOR COURT- |
| | ) | ORDERED EVALUATION |
| | ) | (Pursuant to A.R.S. § 36-523) |
| | ) | |
| re: Mental Health Services) | | |
| _____ | ) | |
| | | |
| STATE OF ARIZONA | ) | |
| | ) | |
| COUNTY OF _____ | ) | |

Petitioner, _____ __

(Medical Director)

being first duly sworn/affirmed, alleges that:

1.   There is now in this County a person whose name and address are as follows:

_____          _____
(Name)                                                      (Address)

2.   The person may presently be found at: _____
_____

3.   There is reasonable cause to believe that the person has a mental disorder and is as a result:

☐ A danger to self;      ☐   A danger to others;

☐ Gravely disabled;    ☐   Persistently or acutely disabled and is:

4.   The person is unwilling to undergo voluntary evaluation, as evidenced by the following facts: _____
_____
_____

5.   The person is unable to undergo voluntary evaluation, as demonstrated by the following reasons: _____
_____
_____

6.   The person is believed to be in need of supervision, care, and treatment because of the following facts: _____
_____
_____

7.   The conclusion that the person has a mental disorder is based on the following facts: _____
_____

8.   The conclusion that the person is dangerous or disabled is based on the following facts: _____
_____

9.   The conclusion that all available alternatives have been investigated and deemed inappropriate is based on the following facts:
_____
_____
_____

10.  Applicant information: _____
Name of Applicant: _____

Exhibit A

TITLE 9. HEALTH SERVICES

CHAPTER 21. ARIZONA HEALTH CARE COST CONTAINMENT SYSTEM (AHCCCS) - BEHAVIORAL HEALTH SERVICES FOR PERSONS WITH SERIOUS MENTAL ILLNESS

Address of Applicant: _____

Relationship to or Interest in the Proposed Patient: _____

11. In the opinion of the Petitioner, the person is _____ is not _____ in such a condition that, without immediate or continuing hospitalization, s/he is likely to suffer serious physical harm or inflict serious physical harm upon another person.

12. In the opinion of the Petitioner, evaluation should _____ should not _____ take place on an outpatient basis, based upon the following reasons: _____
_____
_____

PETITIONER REQUESTS THAT THE COURT:

Issue an Order requiring the person to be given an _____ Inpatient _____ Outpatient evaluation.

_____
DATE            Signature Of Petitioner

_____
Printed or Typed Name

SUBSCRIBED AND SWORN to before me this _____ day of _____, 19 _____.

Notary Public

My Commission Expires:

ADHS/BHS Form MH-105 (9/93)

**Historical Note**
Adopted under an exemption from A.R.S. Title 41, Chapter 6 pursuant to Laws 1992, Ch. 301, § 61, effective October 7, 1992; received in the Office of the Secretary of State October 14, 1992 (Supp. 92-4). Exhibit B repealed, new Exhibit B adopted under an exemption from A.R.S. Title 41, Chapter 6 pursuant to Laws 1992, Ch. 301, § 61, effective September 30, 1993 (Supp. 93-3). Renumbered from a position after R9-21-502 by exempt rulemaking at 9 A.A.R. 3296, effective June 30, 2003 (Supp. 03-2).

Exhibit A

TITLE 9. HEALTH SERVICES

CHAPTER 21. ARIZONA HEALTH CARE COST CONTAINMENT SYSTEM (AHCCCS) - BEHAVIORAL HEALTH SERVICES
FOR PERSONS WITH SERIOUS MENTAL ILLNESS

**R9-21-503.      Voluntary Admission for Evaluation**

**A.**  An application for voluntary evaluation pursuant to A.R.S. § 36-522 shall be submitted on AHCCCS form MH-103, Titled "Application for Voluntary Evaluation," set forth in Exhibit D to a mental health agency.

**B.**  If a health plan receives an application according to subsection (A), the health plan shall provide for such evaluation under A.R.S. § 36-522 for any individual who:
   1.  Voluntarily makes application as provided in subsection (A);
   2.  Gives informed consent; and
   3.  Has not been adjudicated as an incapacitated person pursuant to A.R.S. Title 14, Chapter 5, or Title 36, Chapter 5.

**C.**  Any mental health agency, which is not a health plan under R9-21-501, that receives an application for voluntary evaluation shall immediately refer the individual to:
   1.  The county responsible for voluntary evaluations; or
   2.  If the county has contracted with a health plan for voluntary evaluations, the appropriate health plan.

**D.**  Any mental health agency providing voluntary evaluation services pursuant to this Article shall place in the medical record of the individual to be evaluated the following:
   1.  A completed copy of the application for voluntary treatment;

   2.  A completed informed consent form pursuant to R9-21-511; and
   3.  A written statement of the individual's present mental condition.

**E.**  Voluntary evaluation shall proceed only after the individual to be evaluated has given informed consent on AHCCCS form MH-103 and received information that the patient-physician privilege does not apply and that the evaluation may result in a petition for the individual to undergo court-ordered treatment or for guardianship in the method prescribed by A.R.S. § 36-522.

**Historical Note**

Adopted under an exemption from A.R.S. Title 41, Chapter 6 pursuant to Laws 1992, Ch. 301, § 61, effective October 7, 1992; received in the Office of the Secretary of State October 14, 1992 (Supp. 92-4). Former Section R9-21-503 renumbered to R9-21-502; new Section R9-21-503 renumbered from R9-21-504 and amended by exempt rulemaking at 9 A.A.R. 3296, effective June 30, 2003 (Supp. 03-2). Amended by final rulemaking at 29 A.A.R. 898 (April 21, 2023), effective May 30, 2023 (Supp. 23-1).

Exhibit A

*Arizona Administrative Code*                                      **9 A.A.C. 21**

TITLE 9. HEALTH SERVICES

CHAPTER 21. ARIZONA HEALTH CARE COST CONTAINMENT SYSTEM (AHCCCS) - BEHAVIORAL HEALTH SERVICES
FOR PERSONS WITH SERIOUS MENTAL ILLNESS

**Exhibit D.    Application for Voluntary Evaluation**

### APPLICATION FOR VOLUNTARY EVALUATION
(Pursuant to A.R.S. § 36-522)

The undersigned hereby requests a mental health evaluation to be performed by psychiatrists, psychologists, and social workers at

_____
(Regional Authority)

on the following terms:

INPATIENT. I agree to remain as an inpatient in the above agency for a period of not more than 72 hours. I understand that, at the end of that period, the agency must release me or file a Petition for Court-Ordered Treatment, in which case I may be held until the court holds a hearing, which shall be no longer than six days from the date of filing the petition, excluding weekends and holidays. If such a Petition is filed, I will have the right to representation by a lawyer, and the court will appoint one for me if I cannot afford one.

OUTPATIENT. I agree to keep all scheduled appointments required for a complete evaluation, to the best of my ability. I understand that if I fail to appear, a Petition for Court-Ordered Evaluation or Treatment may be filed, in which case I may be detained and required to undergo involuntary evaluation and treatment. If such a Petition is filed, I will have the right to representation by a lawyer, and the court will appoint one for me if I cannot afford one.

_____ I understand that the physician-patient privilege does not apply, and information I give during this evaluation may be used in court in a civil hearing for court-ordered treatment.

_____ I understand that this evaluation may lead to a court hearing to determine if I need further treatment and that such treatment, or an investigation into the need for a guardianship, may be ordered by a court.

_____ I understand that an application for my examination has been filed and I choose to be evaluated voluntarily rather than by court order.

_____ I understand that my evaluation must take place within five days of my application.

_____ I understand that I have a right to require the person who has applied for my evaluation to present evidence of the need for such evaluation to a court of law for approval or disapproval and I waive my right to require prior court review of the application.

_____ I understand that I have a right, upon written request, to be discharged within 24 hours of that request (excluding weekends and holidays) unless the medical director of the evaluation agency files a petition for court-ordered evaluation.



Presented By                              Signature of Applicant


                                          Printed or Typed Name of Applicant


                                          Date


ADHS/BHS Form MH-103 (9/93)

**Historical Note**
Adopted under an exemption from A.R.S. Title 41, Chapter 6 pursuant to Laws 1992, Ch. 301, § 61, effective October 7, 1992; received in the Office of the Secretary of State October 14, 1992 (Supp. 92-4). Exhibit D repealed, new Exhibit D adopted under an exemption from A.R.S. Title 41, Chapter 6 pursuant to Laws 1992, Ch. 301, § 61, effective September 30, 1993 (Supp. 93-3). Renumbered from a position after R9-21-504 by exempt rulemaking at 9 A.A.R. 3296, effective June 30, 2003 (Supp. 03-2).

EXHIBIT B  42 U.S.C.  9501

Mental Health Patients' Bill of Rights

Enacted by Pub. L. 96398, title V,  501, Oct. 7, 1980, 94 Stat. 1564

Source: U.S. Government Publishing Office

https://www.govinfo.gov/app/details/USCODE-2022-title42

This federal statute outlines the rights of individuals receiving mental health services to be treated with dignity, to receive individualized care, and to not be subjected to treatment without informed consent except under emergency clinical judgment. It prohibits punitive treatment practices and establishes standards rooted in professional medical care.

EXHIBIT B  42 U.S.C.  9501  Mental Health Patients' Bill of Rights

It is the policy of the United States that each resident of a facility for the treatment of mental illness should have,

on an equal basis with all other residents, the right to:

1. Be treated with dignity as a human being;

2. Receive appropriate treatment and related services, under conditions that restrict liberty only to the extent necessary;

3. Be protected from harm, including unnecessary or excessive physical restraint, isolation, medication, or neglect;

4. Be informed of their rights in a comprehensible manner;

5. Participate in treatment planning and decisions, including access to records;

6. Refuse treatment, including medication, except in an emergency or by court order;

7. Privacy and confidentiality in treatment and personal matters;

8. Communicate with others, including visits and access to mail and phone;

9. Assert grievances and have them addressed in a fair and timely manner;

10. Be free from retaliation for exercising rights.

This section sets forth the basic treatment rights afforded to individuals receiving mental health services funded by federal programs,

and forms part of the basis for civil rights claims when those rights are violated.

Enacted by Pub. L. 96398, title V,  501, Oct. 7, 1980, 94 Stat. 1564.

Source:          U.S.          Government          Publishing          Office

Exhibit C

**U.S. Department of Justice**
Office of the Attorney General

**U.S. Department of Health and Human Services**
Office of the Secretary

# Annual Report of the Departments of Health and Human Services and Justice




# Health Care Fraud and Abuse Control Program FY 2020

Exhibit C

# The Department of Health and Human Services
## and
# The Department of Justice

# Health Care Fraud and Abuse Control Program
## Annual Report for Fiscal Year 2020

**July 2021**

Exhibit C

---

# TABLE OF CONTENTS

| | | |
|---|---|---|
| I. | EXECUTIVE SUMMARY | 1 |
| II. | STATUTORY BACKGROUND | 3 |
| III. | Program Results and Accomplishments | 5 |
| | Monetary Results | 5 |
| | Expenditures | 7 |
| | Overall Recoveries | 8 |
| | Strike Force | 8 |
| | Opioid Fraud and Abuse Detection Unit | 10 |
| | Health Care Fraud Prevention and Enforcement Action Team | 11 |
| | (HEAT) Health Care Fraud Prevention Partnership (HFPP) | 12 |
| | COVID-19 Pandemic-Related Enforcement | 13 |
| | Highlights of Significant Criminal and Civil Investigations | 14 |
| IV. | DEPARTMENT OF HEALTH AND HUMAN SERVICES | 31 |
| | Office of Inspector General | 31 |
| | Centers for Medicare & Medicaid Services | 59 |
| | Administration for Community Living | 83 |
| | Office of the General Counsel | 87 |
| | Food and Drug Administration Pharmaceutical Fraud Program | 91 |
| V. | DEPARTMENT OF JUSTICE | 94 |
| | United States Attorneys | 94 |
| | Civil Division | 96 |
| | Criminal Division | 101 |
| | Civil Rights Division | 106 |
| | Office of the Inspector General | 110 |
| VI. | APPENDIX | 111 |
| | Federal Bureau of Investigation | 111 |
| | Total Health Care Fraud and Abuse Control Resources | 118 |
| VII. | Glossary of Common Terms | 119 |

---

**GENERAL NOTE**

All years are fiscal years unless otherwise
stated in the text.

Exhibit C

# EXECUTIVE SUMMARY

The Health Insurance Portability and Accountability Act of 1996 (HIPAA) established a national Health Care Fraud and Abuse Control Program (HCFAC or the Program) under the joint direction of the Attorney General and the Secretary of the Department of Health and Human Services (HHS),[1] acting through the Inspector General, designed to coordinate federal, state, and local law enforcement activities with respect to health care fraud and abuse. In its 24th year of operation, the Program's continued success confirms the soundness of a collaborative approach to identify and prosecute the most egregious instances of health care fraud, to prevent future fraud and abuse, and to protect program beneficiaries.

During Fiscal Year (FY) 2020, the Federal Government won or negotiated more than $1.8 billion in health care fraud judgments and settlements,[2] in addition to other health care administrative impositions. Because of these efforts, as well as those of preceding years, almost $3.1 billion was returned to the Federal Government or paid to private persons in FY 2020. Of this $3.1 billion, the Medicare Trust Funds[3] received transfers of approximately $2.1 billion during this period, in addition to the $128.2 million in Federal Medicaid money that was similarly transferred separately to the Treasury due to these efforts.

## Enforcement Actions

In FY 2020, the Department of Justice (DOJ) opened 1,148 new criminal health care fraud investigations. Federal prosecutors filed criminal charges in 412 cases involving 679 defendants. A total of 440 defendants were convicted of health care fraud related crimes during the year. Also, in FY 2020, DOJ opened 1,079 new civil health care fraud investigations and had 1,498 civil health care fraud matters pending at the end of the fiscal year. Federal Bureau of Investigation (FBI) investigative efforts resulted in over 407 operational disruptions of criminal fraud organizations and the dismantlement of the criminal hierarchy of more than 101 health care fraud criminal enterprises.

In FY 2020, investigations conducted by HHS's Office of Inspector General (HHS-OIG) resulted in 578 criminal actions against individuals or entities that engaged in crimes related to Medicare and Medicaid, and 781 civil actions, which include false claims and unjust-enrichment lawsuits filed in federal district court, civil monetary penalties (CMP) settlements, and administrative recoveries related to provider self-disclosure matters. HHS-OIG also excluded 2,148 individuals and entities from participation in Medicare, Medicaid, and other federal health care programs. Among these were exclusions based on criminal convictions for crimes related to Medicare and Medicaid (891) or to other health care programs (316), for patient abuse or neglect (230), and as

---

[1] Hereafter, referred to as the Secretary.
[2] The amount reported as won or negotiated only reflects the federal recoveries and therefore does not reflect state Medicaid monies recovered as part of any global federal-state settlements.
[3] The Medicare Trust Funds is the collective term for the Medicare Hospital Insurance (Part A) Trust Fund and the Supplemental Medical Insurance (Part B) Trust Fund.

Exhibit C

a result of state health care licensure revocations (509).  HHS-OIG also issued numerous audits and evaluations with recommendations that, when implemented, would correct program vulnerabilities and save Medicare and Medicaid funds.

## Sequestration Impact

Due to the FY 2020 sequestration of mandatory funding, DOJ, FBI, HHS, and HHS-OIG had fewer resources to fight fraud and abuse of Medicare, Medicaid, and other health care programs.[4] A total of $11.0 million was sequestered from the HCFAC program in FY 2020, for a combined total of $150.6 million in mandatory funds sequestered in the past eight years.  Including funds sequestered from the FBI ($70.0 million in the past eight years), $220.6 million has been sequestered from mandatory HCFAC funds since FY 2013.

---

[4] Section 3709 of the Coronavirus Aid, Relief, and Economic Security Act (CARES Act) (Public Law (P.L.) 116-136) suspended Medicare sequestration from May 1, 2020 through December 31, 2020; the Consolidated Appropriations Act, 2021 (P. L. 116-260) extended this suspension to March 31, 2021; and an extension of the Medicare sequester moratorium until December 31, 2021 was signed by President Joe Biden in April 2021. This sequester adjustment was meant to provide an economic boost to Medicare providers treating patients during the COVID-19 public health emergency (PHE) and has resulted in additional funding for the HCFAC program.  A pro-rated sequester suspension was applied to resources from which the sequester reduction is taken at the beginning of the fiscal year, so the FY 2020 sequester amount reflects the period from May 1, 2020 to September 30, 2020.  The FY 2021 sequester amount will reflect the period from October 1, 2020 to December 31, 2021.